UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PERRIGO PHARMA
INTERNATIONAL DESIGNATED
ACTIVITY CO.,

                          Plaintiff,

         – against –

MEAD JOHNSON & CO. LLC,

                          Defendant.

**OPINION & ORDER**

23-cv-00008 (ER)

R‍AMOS, D.J.:

This action arises from Perrigo Pharma International Designated Activity Company's allegations that Mead Johnson & Co. LLC refused to perform its contractual duties to package infant formula manufactured by Perrigo.  Before the Court is Mead Johnson's motion to dismiss Perrigo's amended complaint.  Doc. 96.  For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

### A.  The Parties

Perrigo is a manufacturer of infant formula.  Doc. 72 ¶ 15 ("Am. Compl.").  It is incorporated in Ireland and its principal place of business is Dublin, Ireland.  *Id.* ¶ 8.

Mead Johnson is a limited liability company organized under the laws of Delaware.  *Id.* ¶ 9.  Its sole member, Mead Johnson Nutrition Company, is a corporation incorporated under the laws of Delaware and its principal place of business is Evansville, Indiana.  *Id.* ¶¶ 9–10.  Mead Johnson manufactures, packages, and sells its own infant formula.  *Id.* ¶¶ 85, 87, 92.

### B.  Perrigo's Infant Formula Business

Perrigo manufactures two types of infant formula:  "regular" formula and extensively hydrolyzed ("EH") formula, which is suitable for infants allergic to cow's milk.  *Id.* ¶ 4.  Perrigo manufactures both types of infant formula at a facility in

Covington, Ohio (the "Ohio Facility").  *Id.* ¶¶ 15–16.  Perrigo cannot manufacture both types of formula simultaneously.  *Id.* ¶ 17.  Before EH formula can be manufactured, ███ ████████████████████████████████████████████████████  *Id.*  To minimize these shutdowns, Perrigo manufactures EH formula in intensive "campaigns" lasting ██████████████████████  *Id.*

Infant formula is perishable, so Perrigo must have it packaged promptly after production in order to avoid spoilage.  *Id.* ¶ 18.  Thus, although Perrigo generally seeks to manufacture as much formula as possible, its production is constrained by its ability to have the formula packaged.  *Id.*  To sell its formula in the U.S. market, Perrigo must obtain clearance from the Food and Drug Administration ("FDA").  *Id.* ¶ 19.  This requires having its formula packaged at FDA-approved packaging sites.  *Id.*  Because the Ohio Facility lacks the ability to package infant formula, Perrigo must ship the formula produced there elsewhere to have it packaged.  *Id.* ¶ 20.

On March 14, 2019, Perrigo and Maple Island, Inc., entered into a Master Services Agreement (the "MSA") under which Maple Island agreed to package Perrigo's infant formula at an FDA-approved packaging facility in Wanamingo, Minnesota (the "Wanamingo Facility").  *Id.* ¶¶ 20, 22.  ████████████████████████████ ████████████████████████████████████████████  *Id.* ¶ 20.  ███ ████████████████████████████████████████████████████ ██████  *Id.* ¶ 21.  ██████████████████████████████████████████ ████  so that EH formula can be packaged.  *Id.*  On March 27, 2020, Perrigo and Maple Island entered into two agreements amending and supplementing the MSA:  an Addendum to the MSA (the "Addendum") and an Amendment to the MSA (the "Amendment").  *Id.* ¶ 23.

In early 2021, Mead Johnson purchased the Wanamingo Facility from Maple Island.  *Id.* ¶ 24.  Under the MSA, Maple Island could not assign its agreements with Perrigo to Mead Johnson without Perrigo's consent.  *Id.*  Thus, on January 20, 2021,

Perrigo, Mead Johnson, and Maple Island entered into an agreement pursuant to which (1) Maple Island assigned to Mead Johnson its rights and obligations under the MSA, the Addendum, and the Amendment, and (2) Perrigo consented to the assignment (the "Consent," and collectively with the MSA, the Addendum, and the Amendment, the "Agreement"). *Id.* ¶ 25.

### C. The Agreement's Terms

#### 1. The Consent

Out of concern that Mead Johnson, a major infant formula manufacturer, was purchasing a critical link in Perrigo's infant formula supply chain, Perrigo negotiated for additional provisions in the Consent, two of which are relevant here. *Id.* ¶¶ 25–26. First, Perrigo conditioned its consent to assignment on Mead Johnson making an annual packaging capacity commitment—and agreeing to accept purchase orders up to those capacity commitments—for Perrigo's regular and EH formula in 2021, 2022, and 2023. *Id.* ¶ 26. Second, Perrigo conditioned its consent on extending the notice period in the MSA's termination-for-convenience provision. *Id.* ¶ 27. ██████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
*Id.* ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████ *Id.*

#### 2. Mead Johnson's Packaging Obligations

Under the terms of the Agreement, to order packaging services, Perrigo must send written purchase orders to Mead Johnson. *Id.* ¶ 30. Purchase orders need not be in any particular format. *Id.* ████████████████████████████████████████

███████████████████████████████ [1] *Id.*  Perrigo may also specify a
delivery date in a purchase order, which Mead Johnson must meet so long as the delivery
date is ████████████████ from the date of the purchase order.[2]  *Id.* ¶ 34.

Perrigo alleges that under the express terms of the Agreement, Mead Johnson is
required to (1) accept Perrigo's purchase orders, (2) package the quantity of formula
ordered, and (3) deliver the packaged formula to Perrigo.  *Id.* ¶¶ 28–34.

The Consent provides: ████████████████████████████████
████████████████████████████████████████ *Id.* ¶ 31
(emphasis omitted).

Schedule 1 to the MSA confirms Mead Johnson's obligation to accept purchase
orders for EH formula packaging.  *Id.* ¶ 32.  It provides: ███████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████
████████████████ *Id.* (emphasis omitted).  Schedule 2 to the MSA
includes a parallel provision that confirms Mead Johnson's obligation to accept purchase
orders for regular formula packaging.  *Id.* ¶ 33.

Furthermore, section 3.3 of the MSA provides:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[1] The MSA provides: ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ Am.
Compl. ¶ 30 (emphasis omitted).

[2] The MSA provides: ████████████████████████████████
████████████████████████████████████████████████
Am. Compl. ¶ 34 (omission in original) (emphases omitted).

4



*Id.* ¶ 29 (emphases omitted).  The MSA defines ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████ *Id.* (second alteration in original).

The sole exception to Mead Johnson's duty to package the formula is if Perrigo has not sent Mead Johnson a sufficient amount of infant formula to package.[3]  *Id.* ¶ 34.

The Agreement allows for minor variations from the terms of purchase orders.  *Id.* ¶ 36.  For regular formula, Mead Johnson is expected ██████████████████ ████████████████████████████████████ ████████████████████████████████████████ █████████████████████████; *see* Doc. 9-1 at 56, 59.[4]

### 3.  *The No Waiver Provision*

The MSA includes █████████████████████████████████ ████████████████████████████████ Doc. 9-1 at 23.  The provision contains two clauses.  *Id.*  The first clause (the █████████████████ █████) states:

---

[3] The Addendum provides: ████████████████████████████████████████ ████████████████████████████████████████ █████████████████ Am. Compl. ¶ 35 (emphasis omitted).

[4] Perrigo submitted Doc. 9-1 in connection with its application for a temporary restraining order and preliminary injunction.  It includes the MSA, the Addendum, the Amendment, and the Consent.  The Court may consider these documents because they are incorporated by reference in and integral to the amended complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).



*Id.*  The second clause (the █████████████) states:



*Id.*

### 4.  *The Limitation of Liability Provision*

The MSA also includes a limitation of liability provision.  *Id.* at 19–20.  It provides that:



*Id.* (capitalization omitted).

### D.  The Parties' Performance of the Agreement

At all relevant times, Perrigo sent written purchase orders for packaging services to Mead Johnson in a spreadsheet format.  Am. Compl. ¶ 39.  Each purchase order specified the quantities of formula to be packaged.  *Id.*

Under the parties' longstanding, accepted practice, Perrigo's purchase orders specified the date that Mead Johnson was to commence packaging—as opposed to delivering—each batch of formula.  *Id.*  Due to variations in the time required to package formula, perform quality testing, and prepare release paperwork, the date Mead Johnson released packaged formula to Perrigo varied, but it was typically ██████████████ after

packaging was completed.  *Id.*  According to Perrigo, a failure by Mead Johnson to deliver packaged formula within this time frame is a material breach of the Agreement. *Id.*

Perrigo alleges that it has a clear contractual right to require Mead Johnson to perform under the Agreement by the letter of Perrigo's purchase orders.  *Id.* ¶ 40.  Since Mead Johnson purchased the Wanamingo Facility, however, Perrigo has tried to work with Mead Johnson to select mutually agreeable packaging dates.  *Id.*  Perrigo has also made an effort to give Mead Johnson several months' notice of planned EH campaigns. *Id.*

However, Mead Johnson commonly failed to meet the agreed-upon packaging schedules.  *Id.* ¶ 41.  Its inability to honor the parties' agreed-upon schedules was exacerbated by the infant formula crisis—discussed in more detail below—that began in February 2022.  *Id.* ¶ 58.  Despite these difficulties, until November 2022, the parties continued to work to find mutually agreeable schedules that gave Perrigo steady access to Mead Johnson's packaging services while accommodating Mead Johnson's "persistent operational problems and delays."  *Id.* ¶ 41.  But Perrigo "has never agreed to allow Mead Johnson to ████████████████████ or ████████████████████ ████████████████████████  *Id.* ¶ 42.

   1.  *Perrigo Orders Packaging Services for December 2022 and January 2023*

Perrigo sent multiple purchase orders to Mead Johnson, with ████████████ ██████ lead time, for regular formula to be packaged in December 2022 and the first week of January 2023.  *Id.* ¶ 44.  On August 3, 2022, for example, Perrigo sent a purchase order for Mead Johnson to package ████████ of regular formula beginning on specified dates in November 2022 ████████████████████, December 2022 ████████████████████, and January 2023 ████████████████████ (the "August 3 Purchase Order").  *Id.* ¶¶ 44, 46, 48.

On August 31, 2022, Mead Johnson "accepted"[5] the August 3 Purchase Order as to ███████████ Perrigo ordered to be packaged in November 2022 and ████ ████ Perrigo ordered to be packaged in December 2022 (the "August 31 Acceptance"). *Id.* ¶ 46. In the August 31 Acceptance, Mead Johnson added its own packaging dates for ███████████ directly to Perrigo's purchase order spreadsheet, some of which were up to ██████████ than Perrigo's specified dates. *Id.* ¶ 47.

By November 16, 2022, Mead Johnson did the same as to ██████████ Perrigo ordered to be packaged in January 2023. *Id.* ¶ 48. Mead Johnson's packaging date for ██████ was ██████████ the one specified by the August 3 Purchase Order. *Id.*

The table below summarizes the relevant information from the August 3 Purchase Order spreadsheet, including Mead Johnson's alternative packaging dates. *Id.* ¶ 49.



| Order number | Packaging start date ordered by Perrigo | Pounds of regular formula to be packaged | Mead Johnson packaging schedule |
|---|---|---|---|
| ███ | ███ | ███ | ███ |

Perrigo delivered to the Wanamingo Facility, and Mead Johnson had available to package, sufficient quantities of regular formula to fulfill these orders. *Id.* ¶ 51.

---

[5] Throughout this section, the Court quotes the amended complaint directly to reflect Perrigo's characterization of certain events. While the Court uses Perrigo's language, it notes that some of these characterizations—such as Perrigo's allegation that Mead Johnson "accepted" the August 3 Purchase Order—are legal conclusions that the Court need not credit in deciding this motion. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

2. *Perrigo Orders EH Formula Packaging Services for January and February 2023*

Along with the foregoing schedule for regular formula, Perrigo's manufacturing plans for 2022 initially included two EH campaigns, one in April and one in October. *Id.* ¶ 53. The April 2022 campaign proceeded as planned. *Id.* In April 2022, Perrigo's internal forecast indicated that it would have enough EH formula to last through January 2023, so Perrigo informed Mead Johnson that the next EH campaign would be in January 2023 rather than October 2022. *Id.* On April 19, 2022, Mead Johnson agreed to package an EH campaign for Perrigo in January 2023. *Id.*

As it turned out, Perrigo's internal forecast regarding its supply of EH formula was inaccurate. *Id.* ¶ 54. Perrigo practically exhausted its EH formula inventory by October 2022. *Id.* Perrigo informed its customers that EH formula would be available again following the January 2023 campaign. *Id.*

On at least one occasion, Perrigo—again providing ███████████ lead time—instructed Mead Johnson to package specific quantities of EH formula in January and February 2023. *Id.* ¶ 55. On October 11, 2022, Perrigo sent a purchase order spreadsheet to Mead Johnson instructing it to package ██████████ totaling ████████ of EH formula beginning on specified dates in January and February 2023 (the "October 11 Purchase Order"). *Id.*

The table below summarizes the relevant information from the October 11 Purchase Order. *Id.* ¶ 56.



| Order number | Packaging start date ordered by Perrigo | Pounds of EH formula to be packaged |
|---|---|---|
| | | |

Perrigo alleges that Mead Johnson did not schedule any EH formula packaging or deliver any EH formula to Perrigo in January or February 2023. *Id.* ¶ 57.

### 3. *Mead Johnson Allegedly Repudiates Its Obligations and Breaches the Agreement*

Perrigo repeatedly expressed concerns to Mead Johnson about its failure to honor the agreed-upon packaging schedules, and Mead Johnson was responsive to Perrigo's concerns. *Id.* ¶ 58. Perrigo understood that Mead Johnson was attempting to make changes to the Wanamingo Facility to improve its service. *Id.* On September 27, 2022, Perrigo representatives visited the facility and discussed with Mead Johnson representatives the importance of Mead Johnson's packaging obligations, as well as Mead Johnson's problems with maintaining the packaging schedule. *Id.* ¶ 59. Mead Johnson's representatives affirmed Mead Johnson's commitment to honor the terms of the Agreement. *Id.*

On December 9, 2022, Mead Johnson informed Perrigo, for the first time, that it would package only ███████████████████ of regular formula in December 2022, ███████████████████ of regular formula in January 2023 (for a total of

█████████████████████████ in February and March 2023, and ████████████ in the first quarter of 2023.  *Id.* ¶¶ 60–61.  According to Perrigo, Mead Johnson had already accepted the August 3 Purchase Order (representing over █████████████ of regular formula) and was required under the Agreement to accept the October 11 Purchase Order (representing ████████████ of EH formula).  *Id.* ¶ 61.  Mead Johnson stated that it would inform Perrigo within thirty days whether it would package ██ Perrigo infant formula after March 2023.  *Id.*

At the time, Mead Johnson had already accepted for packaging nearly ████████ ████ of regular formula into the Wanamingo Facility.  *Id.* ¶ 62.  Mead Johnson's decision all but ensured that ███████████████ of regular formula would expire before packaging.  *Id.*

Perrigo found Mead Johnson's decision unacceptable, and it attempted to resolve the issue in communications with senior Mead Johnson representatives.  *Id.* ¶ 63.  On December 12, 2022, Mead Johnson confirmed the statements it had made on December 9—namely, that it would package a total of only ████████████ of regular formula in December 2022 and January 2023.  *Id.*  As a result, Perrigo was forced to halt manufacturing of regular formula and to cancel the January EH campaign because it was concerned the product would expire before it could be canned.  *Id.* ¶¶ 64, 69.

On December 15, 2022, Perrigo sent Mead Johnson a letter detailing Mead Johnson's obligations under the Agreement.  *Id.* ¶ 65.  Perrigo emphasized that Mead Johnson's decision threatened to cause large amounts of formula to expire during a national infant formula crisis.  *Id.*  In a letter dated December 19, 2022, Mead Johnson informed Perrigo that it could not fulfill its infant formula packaging obligations to Perrigo pursuant to the Agreement.  *Id.* ¶ 66.

Ultimately, Mead Johnson packaged approximately ████████████ of regular formula in December 2022, ███████████████ in the first week of January 2023, and ███ ██████████ in January and February 2023.  *Id.* ¶¶ 68–69.

### E.  Allegations of Bad Faith

Based on these events and other circumstances, Perrigo alleges that Mead Johnson's actions were in bad faith.

#### 1.  *The Infant Formula Crisis*

As mentioned above, parts of the United States began experiencing shortages of infant formula in late 2021.  *Id.* ¶ 81.  In February 2022, Abbott Laboratories, the largest manufacturer of infant formula in the United States, announced a recall that exacerbated the shortages.  *Id.*  By mid-2022, many states had an out-of-stock rate for infant formula between 40% and 50%.  *Id.* ¶ 85.

Abbott was a major participant in the federal Special Supplemental Nutrition Program for Women, Infants and Children ("WIC") program.  *Id.* ¶ 82.  WIC safeguards the health of low-income women and children up to age five who are at nutritional risk by providing nutritious foods—including infant formula—to supplement their diets.  *Id.*  As of June 2022, WIC served more than 40% of U.S. infants and accounted for more than half of infant formula consumption.  *Id.*

Although WIC is a federal program, it is administered by state agencies, who generally purchase infant formula from a single supplier.  *Id.* ¶ 83.  States run a competitive bidding process to select the supplier, and manufacturers compete to offer discounts—in the form of rebates—to be selected.  *Id.*  These single-supplier contracts are highly lucrative and therefore are highly competitive even under ordinary conditions.  *Id.* ¶ 84.

Only three companies have WIC single-supplier contracts:  Abbott, Mead Johnson, and Nestle (through the Gerber line of infant formula).  *Id.* ¶ 85.  Abbott infant formula was recalled in February 2022.  *Id.*  As of May 2022, Abbott was the single WIC supplier for thirty-five states and territories covering 47% of infants in the United States.  *Id.*

Perrigo alleges that three aspects of the infant formula crisis incentivized Mead Johnson to package and sell its own formula, decline to package Perrigo formula, and allow Perrigo formula awaiting packaging to expire. *Id.* ¶ 87. First, governmental authorities relaxed the single-source supplier rule. *Id.* ¶ 88. WIC participants were temporarily permitted to purchase any formula in states where Abbott was the single supplier. *Id.* As a result, formula sold by Mead Johnson—or other manufacturers—could support the WIC program in Abbott states. *Id.*

Second, governmental authorities temporarily lifted restrictions on importing infant formula. *Id.* ¶ 89. Mead Johnson imported a large volume of infant formula from Singapore, which it packaged at the Wanamingo Facility. *Id.*

Third, Mead Johnson aggressively pursued new WIC single-supplier contracts. *Id.* ¶ 90. Over the course of 2022, Mead Johnson won single-supplier contracts for Texas, Minnesota, Iowa, and Puerto Rico, thereby expanding its WIC customer base. *Id.* Perrigo alleges that Mead Johnson "was well aware of its contractual obligations to Perrigo when it did so." *Id.* ¶ 66.

In its December 19, 2022, letter to Perrigo, Mead Johnson cited its WIC commitments as a reason for largely excluding Perrigo from packaging services in the first quarter of 2023. *Id.* ¶¶ 66, 91. But Mead Johnson produced and sold over 35 million pounds of non-WIC product in the United States in 2022. *Id.* ¶ 66. And after the parties eventually agreed to a packaging schedule in January 2023 (discussed in more detail below), Mead Johnson ███████████████████████████████ of regular formula in the first quarter of 2023. *Id.* ¶ 91.

According to Perrigo, Mead Johnson "exploited the [infant formula] crisis to line its own pockets and to damage Perrigo's business, reputation, and customer relationships." *Id.* ¶ 87. Perrigo also alleges that Mead Johnson "used the WIC program as a pretext and was in fact motivated by its intention to harm Perrigo's business,

reputation, and customer relationships, and particularly harm Perrigo's EH formula business." *Id.* ¶ 91.

    *2.  Mead Johnson's Campaign Against EH Formula*

Perrigo introduced EH formula to the market in June 2021, following years of sustained efforts and significant financial investment. *Id.* ¶ 93. Perrigo sells EH formula to major retailers, who use it as their store-brand hypoallergenic formula. *Id.* ¶ 94. Perrigo's EH formula is the only generic hypoallergenic formula on the market. *Id.*

On July 30, 2021, weeks after Perrigo's EH formula reached the market, Mead Johnson demanded that Perrigo cease making certain claims in its EH formula advertising because they were supposedly untrue. *Id.* ¶ 95. Perrigo defended the truth of its claims, and the two companies privately negotiated a resolution that allowed Perrigo's advertising to continue to use certain claims Mead Johnson had challenged. *Id.*

In March 2022, however, Mead Johnson filed a complaint with the National Advertising Division ("NAD") of the Better Business Bureau National Programs, a self-regulatory body for the advertising industry. *Id.* ¶¶ 96–97. The NAD hears challenges to allegedly misleading advertising claims. *Id.* ¶ 96. After hearing from both parties, it typically issues a final written decision that either sustains challenged claims as substantiated or recommends discontinuing or modifying claims. *Id.* NAD decisions are nonbinding but widely respected, and advertisers typically follow the recommendations. *Id.*

Mead Johnson challenged as misleading Perrigo's advertisements stating that its EH formula was significantly more affordable than other hypoallergenic formulas. *Id.* ¶ 97. On October 21, 2022, the NAD issued a final decision (the "NAD Decision"), *id.* ¶ 100, upholding some of Perrigo's advertising claims. *See National Advertising Division Finds Certain Perrigo Infant Formula Cost Savings Claims Supported; Recommends*

*Others Be Modified or Discontinued*, BBB Nat'l Programs (Nov. 30, 2022).[6]  However, the NAD found that some of Perrigo's advertising claims were not supported and recommended that they be modified or discontinued. *Id.*

On December 9, 2022—nine days after the NAD issued its press release—Mead Johnson "repudiated its contractual obligation to package EH formula in January and February 2023." Am. Compl. ¶ 102.  Perrigo alleges that "Mead Johnson's campaign against EH formula, including its decision to deny Perrigo access to EH formula packaging services during the first quarter of 2023, was undertaken ████████████ ████████████████████████████████████████ to harm Perrigo's business, reputation, and customer relationships, and to undermine and potentially destroy Perrigo's EH formula business." *Id.*

    3.  *Mead Johnson's Refusal to* ███████████████████

In mid-2022, Mead Johnson began ████████████████████████████ ████████████████ *Id.* ¶ 103.  The Agreement ██████████████████████ ████████████[7] *Id.* ¶ 104.  Mead Johnson recognized the importance ███████ in the Agreement itself.[8]  *Id.* ¶ 105.

Perrigo insisted on these provisions in part because ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* ¶ 106. ██████████ █████████████████████████████ *Id.*

---

[6] Available at https://bbbprograms.org/media-center/dd/perrigo-cost-savings. The Court may consider this press release because it is incorporated by reference in the amended complaint. Am. Compl. ¶ 101; *see DiFolco*, 622 F.3d at 111.

[7] The MSA provides: ███████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ Doc. 9-1 at 9.

[8] The MSA provides: ███████████████████████████████████████ ████████████████████████████████████ Doc. 9-1 at 9.

On May 27, 2022, Perrigo informed Mead Johnson that ███████████████ ██████████████████████████ *Id.* ¶ 108.  From May 27 through July 2022, Perrigo followed up several times.  *Id.*  Mead Johnson indicated that it was considering the matter but never acted on it.  *Id.*  Finally, on July 19, 2022, Mead Johnson stated: "Our legal has provided feedback that we ███████████████ and providing documentation accordingly."  *Id.* (emphasis omitted).

On July 28, 2022, ████████████ contacted Mead Johnson on behalf of a Perrigo customer ██████████████████ *Id.* ¶ 109.  Mead Johnson responded: "We ████████████████ at this time . . . ."  *Id.* (omission in original) (emphasis omitted).  The following day, Mead Johnson emailed Perrigo:  "[W]e are █████████████████████"  *Id.* (alteration in original) (emphasis omitted).  The email included a "Certificate of Compliance" with section 11 of the MSA—which relates to corporate social responsibility but does not address ██████ ████—and incorrectly asserted that the certificate ██████████████ *Id.* The email did not reference ██████████████████████████ ████████████ *Id.*

Perrigo continued to follow up with Mead Johnson throughout the rest of the year. *Id.* ¶ 110.  In an email dated December 21, 2022, Perrigo explained that it had not received any recent updates on ████████ and reported that a major customer ██████ ████████████████████████████████████████████████ ████████████ *Id.* (alteration in original).  The email continued:  "Perrigo needs to understand what concerns [Mead Johnson] has with ████████████ I'm happy to discuss the process and options and am hoping we can get this back on track quickly."  *Id.* (emphasis omitted).

On January 20, 2023, seventeen days after this action was filed, Mead Johnson wrote to Perrigo:  "We have received alignment to proceed ████████████████" *Id.* ¶ 111 (emphasis omitted).  The email included questions on logistical matters, which

Perrigo responded to the same day.  *Id.*  Despite Perrigo's continued efforts to ████

████ nearly two months passed with no progress.  *Id.* ¶ 112.  On March 10, 2023, almost

ten months after Perrigo and its customers began attempting ██████████ Mead

Johnson stated that it was "reviewing carefully what is being requested" and "working

through understanding the background."  *Id.*

    EH customers repeatedly expressed concerns to Perrigo about their inability ██

███████████████  *Id.* ¶ 113.  In December 2022, a major customer informed

Perrigo ███████████████████████

███████████████████  *Id.*  In March 2023, Perrigo learned that

████████████████████████████████████

███████████  *Id.*

    On March 1, 2023, Perrigo informed Mead Johnson that another customer wanted

███████████ on April 13, 2023.  *Id.* ¶ 114.  █████████

███████████████  *Id.*  On March 10, Mead Johnson told Perrigo

that ███████████ was "still with our legal team for response."  *Id.*  That same

day, the customer seeking ██████████ warned Perrigo that it was "concerned on the

level of response and information sharing" from Mead Johnson and that "these are

additional flags proceeding with onboarding."  *Id.* (emphases omitted).

    On March 16, 2023, Perrigo sent a letter to Mead Johnson outlining these events,

warning Mead Johnson that its actions threatened Perrigo's business, and demanding that

Mead Johnson ███████████  *Id.* ¶ 115.  The following week, Mead Johnson began

the process of selecting a date for the ████████████ and ██████████

███████████  *Id.*

    According to Perrigo, "Mead Johnson's ███████████ were ██████████

████████████████████████ intended to harm

Perrigo's business, reputation, and customer relationships, and to undermine and

potentially destroy Perrigo's EH formula business."  *Id.* ¶ 103.

### F. Procedural History

#### 1. *Perrigo Commences This Action*

On January 3, 2023, Perrigo commenced this action and moved for a temporary restraining order and preliminary injunction requiring Mead Johnson to comply with its packaging obligations. *Id.* ¶ 70; *see* Doc. 7. The Court scheduled a hearing on Perrigo's application for January 9, 2023. Am. Compl. ¶ 70.

On that date, Perrigo and Mead Johnson agreed to a packaging schedule for the first quarter of 2023 and recited it on the record before this Court (the "January 9 Agreement"). *Id.* ¶ 71. Under the January 9 Agreement, Perrigo suspended its application for injunctive relief in exchange for Mead Johnson's agreement to package ███████████████████████ of regular formula in January 2023, ██████████ ███████████████ of regular formula in February 2023, ███████████████ of regular formula in March 2023, and an EH campaign in June 2023. *Id.* Perrigo reserved its rights to pursue all claims for damages, including damages caused by the delay of the EH campaign from January and February 2023 to June 2023. *Id.* ¶ 72.

#### 2. *Mead Johnson Allegedly Breaches the January 2023 Packaging Obligation*

On January 9, 2023, Mead Johnson began packaging the regular formula that had been awaiting packaging at the Wanamingo Facility. *Id.* ¶ 74. On January 10, Mead Johnson experienced an equipment failure in an X-ray machine on one of its two packaging lines. *Id.* Mead Johnson can package Perrigo formula on both packaging lines. *Id.* Mead Johnson also can package infant formula without a functioning X-ray machine. *Id.*

On January 14, 2023, Perrigo instructed Mead Johnson to continue to package formula without a functioning X-ray machine. *Id.* ¶ 75. Perrigo intended to use a third-party vendor to X-ray the packaged product. *Id.* Mead Johnson, however, did not continue packaging without an X-ray machine, and it did not use its second packaging line. *Id.* ¶ 76.

Perrigo resumed manufacturing operations at the Ohio Facility on January 15, 2023.  *Id.* ¶ 73.  On January 17, Perrigo learned that Mead Johnson had repaired the X-ray machine and had resumed packaging Perrigo formula.  *Id.* ¶ 77.

On January 30, 2023, Mead Johnson began using both packaging lines to package Perrigo's infant formula.  *Id.* ¶ 78.  Mead Johnson packaged only ███████████ ████████████ of regular formula in January 2023, far less than its commitment of ███ ████████████████ *Id.*  Mead Johnson finished packaging the January commitment on February 6, 2023.  *Id.*

### 3.  *Further Proceedings*

On February 3, 2023, Perrigo asked the Court to restore its application for a temporary restraining order and preliminary injunction.  Doc. 49.  The Court denied the renewed application at a hearing on February 10, 2023.

On March 3, 2023, Mead Johnson moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Doc. 64.  On March 21, 2023, the parties submitted a stipulation providing that Perrigo would file an amended complaint and that Mead Johnson's pending motion would be deemed moot.  Doc. 70. Perrigo filed the amended complaint on March 24, 2023.  Doc. 72.

### 4.  *Perrigo's Claims*

Perrigo brings three claims for breach of contract and one claim for breach of the implied covenant of good faith and fair dealing against Mead Johnson.  *Id.* ¶¶ 124–150.

The first breach of contract claim is for Mead Johnson's alleged failure to package and deliver regular formula pursuant to the August 3 Purchase Order.  *Id.* ¶ 126.  The second breach of contract claim is for Mead Johnson's alleged failure to accept the October 11 Purchase Order, as well as its failure to package and deliver EH formula pursuant to that order.  *Id.* ¶ 132.  The third breach of contract claim is for Mead Johnson's alleged failure to package and deliver regular formula pursuant to the January 9 Agreement.  *Id.* ¶ 140.

Perrigo's claim for breach of the implied covenant of good faith and fair dealing is for Mead Johnson allegedly failing to act in good faith by "announcing in December 2022 that it would severely limit Perrigo's access ███████████████████ ███████████████████████████████████ through at least the first quarter of 2023," as well as "packaging only limited amounts ██████████ in December 2022 and the first part of January 2023, and in not packaging ██████████ during January and February 2023." *Id.* ¶ 147.

Perrigo seeks relief in the form of damages, prejudgment interest, postjudgment interest, and costs (including attorney fees). *Id.* at 33–34. Perrigo's request for damages includes each of the following:

1. Direct damages of at least ██████████████████ that expired as a result of Mead Johnson's alleged failure to fulfill its December 2022 and January 2023 obligations to package such formula. *Id.* ¶ 117.

2. Lost profits damages from being unable to sell that expired formula. *Id.*

3. Lost profits damages from allegedly being ██████████████ ███████████████████████████ *Id.* ¶ 118.

4. Lost profits damages as a result of Mead Johnson's alleged failure to fulfill its January and February 2023 EH packaging obligations. *Id.* ¶ 119.

5. Lost profits damages as a result of Mead Johnson's alleged failure to meet its packaging obligations under the January 9 Agreement. *Id.* ¶ 120.

6. Damages for the harm to Perrigo's customer relationships allegedly caused by Mead Johnson's breaches. *Id.* ¶ 121.

7. Damages for the threatened viability of Perrigo's EH formula business allegedly caused by Mead Johnson's breaches. *Id.* ¶ 122.

Perrigo alleges that ██████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ *Id.* ¶ 123.

Mead Johnson has moved to dismiss each of Perrigo's claims pursuant to Rule 12(b)(6).  Doc. 97.  On May 22, 2023, the Court granted Mead Johnson's request to stay discovery pending resolution of the motion.  Doc. 102.

## II.   LEGAL STANDARD

In considering a motion to dismiss under Rule 12(b)(6), a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The purpose of Rule 12(b)(6) "is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  To state a plausible claim, the plaintiff must "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556).  If the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

III.    DISCUSSION

A.  Claims I and II:  Breach of Contract Relating to the August 3 and October 11 Purchase Orders

Perrigo alleges that the Agreement requires Mead Johnson to accept its purchase orders and deliver packaged infant formula by the date specified.  Am. Compl. ¶¶ 28–34. According to Perrigo, Mead Johnson breached the Agreement by failing to accept the October 11 purchase order and by failing to package and deliver the formula that Perrigo ordered in its August 3 and October 11 purchase orders.  *Id.* ¶¶ 126, 132.

Mead Johnson argues that Perrigo's claims regarding Mead Johnson's alleged failure to pack regular and EH formula in the first quarter of 2023 are moot and must be dismissed with prejudice.  Doc. 97 at 13–14.  It also argues that Perrigo's claims fail because they are insufficiently pled.  *Id.* at 14–16.

1.  *Perrigo's Claims Are Not Moot*

Mead Johnson argues that Perrigo's claims regarding Mead Johnson's alleged failure to pack regular and EH formula in the first quarter of 2023 are mooted by the January 9 Agreement.  *Id.* at 13–14.  It contends that the January 9 Agreement replaced any previously agreed packing schedules for the first quarter of 2023 with new, superseding packaging obligations and thus resolved any live controversy over the previously agreed packaging schedules.  *Id.*

Perrigo responds that the January 9 Agreement did not moot Perrigo's claims for damages since it addressed only Perrigo's request for injunctive relief.  Doc. 104 at 8.  To the contrary, Perrigo alleges that it explicitly reserved the right to maintain its damages claims, which is what it now seeks in its amended complaint.  *Id.*; *see* Am. Compl. ¶ 72.

The Court agrees with Perrigo.  "A case is moot, and accordingly the federal courts have no jurisdiction over the litigation, when the parties lack a legally cognizable interest in the outcome."  *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994) (internal quotation marks and citation omitted).  A settlement agreement "may moot a party's subsequent claims" because it "resolves the live controversy between

parties." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 828 F. App'x 734, 736 (2d Cir. 2020). However, when such a settlement resolves only a claim for injunctive relief, it does not moot a damages claim for harm already inflicted. *See Stokes v. Vill. of Wurtsboro*, 818 F.2d 4, 6 (2d Cir. 1987).

In *Stokes*, the plaintiffs sought declaratory relief and damages from a municipality for terminating water service to their building pursuant to an allegedly unconstitutional law. *Id.* at 4–5. After the municipality stipulated that it would not terminate water service to the building, the district court held that the plaintiffs' suit was moot and dismissed the complaint. *Id.* at 5. The Second Circuit reversed in part, holding that the damages claim was not moot because the stipulation "did not address and therefore does not preclude an action for damages allegedly sustained by the [plaintiffs] when water service was terminated." *Id.* at 6. Although *Stokes* involved a claim for damages following a mooted claim for declaratory relief, the court indicated that the same principle applies in the case of a mooted claim for injunctive relief. *See id.* (citing *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149 (1978), and *Ellis v. Blum,* 643 F.2d 68 (2d Cir. 1981), for the proposition that mooted claims for injunctive relief do not necessarily moot claims for damages).

Here, Perrigo alleges that while the January 9 Agreement resolved its claims for injunctive relief, Perrigo explicitly reserved the right to maintain its damages claims. Am. Compl. ¶¶ 71–72. Therefore, Perrigo's breach of contract claims are not mooted by the January 9 Agreement.[9]

---

[9] The circumstances here are distinct from cases in which the settlement at issue resolved the plaintiff's damages claims. *See, e.g.*, *In re World Trade Ctr.*, 828 F. App'x at 736 (explaining that claims were moot where settlement agreement had "reduced [plaintiffs'] potential recovery in these proceedings to zero"). Perrigo alleges that it explicitly reserved the right to maintain its damages claims in the January 9 Agreement. Am. Compl. ¶¶ 71–72.

*2.  Perrigo's Breach of Contract Claims Are Sufficiently Pled*

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

Mead Johnson argues that Perrigo's breach of contract claims fail as a matter of law because the amended complaint fails to allege both (1) a breach of any obligation and (2) any damages recoverable under the MSA.  Doc. 97 at 14–15.  The Court addresses these arguments in turn.[10]

*a.  Perrigo Has Sufficiently Alleged that Mead Johnson Breached the Agreement*

Mead Johnson does not dispute that, under the express terms of the Agreement, it breached its packaging obligations.  Instead, it argues that the parties' practice of working collaboratively to reach mutually agreeable packaging schedules modified the terms of the agreement such that Perrigo waived its right to obligate Mead Johnson to accept purchase orders without a mutually agreeable schedule.  *Id.* at 15–16.  Mead Johnson argues that no mutually agreeable schedule was reached as to the August 3 purchase order, *id.* at 16, or the October 11 Purchase Order, *id.* at 18–19.  Although Perrigo alleges that Mead Johnson "accepted" the August 3 Purchase Order on August 31, Mead Johnson maintains that the August 3 Purchase Order was as a "proposal," to which Mead Johnson responded on August 31 with a "counter-proposal" that pushed back Perrigo's requested packing dates.  *Id.* at 16–17.  Since Perrigo failed to accept its counter-proposal, no agreement was ever reached and thus no obligation was created.  *Id.*  Mead Johnson therefore contends that, since the parties did not mutually agree on a packaging schedule, it was under no obligation to accept and fulfill the purchase orders.  *Id.*  Mead Johnson also argues that it was under no obligation to fulfill the October 11 Purchase Order since no mutually agreeable schedule was ever reached.  *Id.* at 18–19.

---

[10] The parties agree that New York law applies.

Perrigo denies that it waived its right to demand strict performance of the express terms of the Agreement.  Doc. 104 at 9.  It argues that its conduct is not sufficient to constitute a waiver of its contractual rights and that, even if it is, the Agreement's no waiver clause precludes such a waiver.  *Id.* at 9–13.  Thus, Mead Johnson was obligated to accept and fulfill the August 3 and October 11 Purchase Orders.  *Id.* at 13–15.  By failing to do so, Mead Johnson breached the Agreement.  *Id.*

"Waiver occurs when a plaintiff with 'actual knowledge' of a breach 'continues to perform under and accepts the benefits of a contract.'"  *Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*, No. 11-cv-2589 (JPO) (HBP), 2012 WL 4474587, at *2 (S.D.N.Y. Sept. 28, 2012) (quoting *Sauer v. Xerox*, 5 F. App'x 52, 56 (2d Cir. 2001)).  It "may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage."  *Hadden v. Consol. Edison Co. of N.Y., Inc.*, 382 N.E.2d 1136, 1138 (N.Y. 1978).  A valid waiver "must be not only intentional, but also clear, unmistakable, and without ambiguity."  *Eastman Chem.*, 2012 WL 4474587, at *2 (internal quotation marks and citation omitted).  Intent "is not to be inferred from a doubtful or equivocal act."  *Echostar Satellite L.L.C. v. ESPN, Inc.*, 914 N.Y.S.2d 35, 39 (App. Div. 2010) (citation omitted).  Furthermore, "a party's reluctance to terminate a contract and its attempts to encourage the breaching party to adhere to its obligations do not demonstrate the unmistakable intention to abandon contractual rights."  *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12-cv-2827 (NRB), 2013 WL 1191895, at *7 (S.D.N.Y. Mar. 22, 2013) (internal quotation marks and citation omitted).

Given the importance of intent to this determination, "New York law contains a general rule . . . that questions of waiver are not decided on a motion to dismiss."  *Eastman Chem.*, 2012 WL 4474587, at *3 (omission in original) (internal quotation marks and citation omitted).  There is an exception to this general rule only when "waiver is clear on the face of the complaint" and thus can be determined as a matter of law.  *Id.* (quoting *Schonberger v. Serchuck*, 742 F. Supp. 108, 114–15 (S.D.N.Y. 1990)).

In addition, the MSA contains a no waiver provision.  Doc. 9-1 at 23.  The provision includes a no oral waiver clause and a no course of conduct waiver clause, *id.*, both of which are enforceable in New York.  *See Optima Media Grp. Ltd. v. Bloomberg L.P.*, 383 F. Supp. 3d 135, 151 (S.D.N.Y. 2019) (enforcing a no oral waiver clause); *Fin. Techs. Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 407 (S.D.N.Y. 2002) (enforcing a no course of conduct waiver clause).  Although "the existence of [a non-waiver] clause does not preclude a waiver of contractual rights," *Williams v. Buffalo Pub. Schs.*, 758 F. App'x 59, 63 (2d Cir. 2018), "the New York Court of Appeals has also indicated that such a clause may preclude inferring waiver as a matter of law," *Optima Media*, 383 F. Supp. 3d at 151.

While the bar for finding waiver at this stage is very high, there are some allegations in the complaint that might point toward such a finding.  *See, e.g.*, Am. Compl. ¶¶ 3, 41 (discussing parties' practice of working together to agree to packing schedules).  Perrigo's practice of working collaboratively with Mead Johnson to find mutually agreeable packaging schedules, and thus excusing Mead Johnson's non-performance, for nearly two years could potentially constitute a waiver of the right to demand strict performance.  *See Kamco Supply Corp. v. On the Right Track, LLC*, 49 N.Y.S.3d 721, 728–29 (App. Div. 2017) (where defendants sought damages for the Kamco parties' failure to meet contractual obligation to make minimum monthly purchases, court found that defendants had waived this obligation by "accept[ing], month after month, and without any formal reservation of rights or notice of default, the Kamco parties' continued failure to meet monthly minimum purchase requirements").  Although the *Kamco* court declined to decide precisely when the waiver occurred, it found that it was "clear from the record that it occurred well before" the defendants asserted their counterclaims.  *Id.* at 729.

Perrigo's allegations, however, suggest that it excused Mead Johnson's non-performance due to Mead Johnson's "persistent operational problems and delays."  Am.

Compl. ¶ 41.  Perrigo also alleges that it understood that Mead Johnson was renovating the Wanamingo Facility to improve its performance.  *Id.* ¶ 58.  And Perrigo further alleges that it repeatedly voiced its concerns to Mead Johnson.  *Id.*  For example, on one occasion, Perrigo visited the Wanamingo Facility to discuss the importance of Mead Johnson's packaging obligations and was reassured by Mead Johnson that it would fulfill its contractual obligations.  *Id.* ¶ 59.  Although it is unclear whether Perrigo complained about Mead Johnson's failure to comply with the strict terms of the Agreement, or merely about its failure to meet the agreed-upon packaging schedules, the Court must draw all reasonable inferences in Perrigo's favor at this stage.  Based on the amended complaint's allegations, the Court can plausibly infer that Perrigo persisted in requiring Mead Johnson to perform according to the precise terms of the Agreement to the extent it was able to do so.  Such conduct does not evince a waiver by Perrigo of its rights.  *See Highland*, 2013 WL 1191895, at *7 (explaining that "attempts to encourage the breaching party to adhere to its obligations do not demonstrate the unmistakable intention to abandon contractual rights" (internal quotation marks and citation omitted)).  Rather, such conduct is "consistent with showing patience while encouraging [Mead Johnson] to fulfill its contractual obligations."  *See Optima Media*, 383 F. Supp. 3d at 151.  At this stage, the Court cannot find that any waiver of Perrigo's right to strict performance is "clear on the face of the complaint."  *Eastman Chem.*, 2012 WL 4474587 at *3 (citation omitted).

Perrigo is also correct that the cases Mead Johnson cites, Doc. 97 at 15–16, are distinguishable.  *See Getty Terminals Corp. v. Coastal Oil New England, Inc.*, 995 F.2d 372 (2d Cir. 1993); *Kamco*, 49 N.Y.S.3d 721; *Sec. Indus. Automation Corp. v. United Comput. Cap. Corp.*, 723 N.Y.S.2d 668 (App. Div. 2001).  In none of those cases did the court find a waiver at the motion to dismiss stage.  In *Getty Terminals* and *Kamco*, the trial court's waiver determination was made after a bench trial.  *Getty Terminals*, 995 F.2d

at 373; *Kamco*, 49 N.Y.S.3d at 725–26.  And in *Securities Industry*, the determination was made on summary judgment.  723 N.Y.S.2d at 669.

For these reasons, the Court declines to find that Perrigo waived its right to strict performance as a matter of law.  As a result, Perrigo sufficiently alleges that Mead Johnson was required to accept and fulfill the August 3 and October 11 purchase orders notwithstanding any absence of mutual agreement between the parties.[11]

Mead Johnson also argues that, even if mutual agreement was reached as to the August 3 Purchase Order, it did not breach its packaging obligations because the ███████ ████████████████████████████████ when those obligations were superseded by the January 9 Agreement.  Doc. 97 at 17–18.

The ████████████████ to which Mead Johnson refers is the date it provided in the August 31 Acceptance.  Am. Compl. ¶ 49.  However, Perrigo alleges that the Agreement requires Mead Johnson to package and deliver formula to Perrigo ██ ██████████████████████████████████████████ *Id.* ¶ 34 (emphasis omitted).  Since the Court has found that Perrigo did not, as a matter of law, waive Mead Johnson's obligation to accept purchase orders, Perrigo has adequately pled that Mead Johnson was still obligated to deliver the packaged formula by the date provided in the August 3 purchase order.  Perrigo alleges that this date was ████████████████ before the January 9 Agreement was reached.  *Id.* ¶ 49.  Thus, Mead Johnson's argument is without merit.

For the foregoing reasons, Perrigo has sufficiently alleged that Mead Johnson was required to accept and fulfill Perrigo's purchase orders.  Because Perrigo alleges that Mead Johnson failed to do so, it has sufficiently pled a breach of the Agreement by Mead Johnson.

---

[11] For that reason, the Court need not address Perrigo's alternative argument that it did, in fact, reach mutual agreement with Mead Johnson regarding the August 3 Purchase Order.  Doc. 104 at 13–14.

    *b.   Perrigo Has Sufficiently Alleged Damages that Are Recoverable Under the Agreement*

Mead Johnson also argues that Perrigo's breach of contract claims fail because Perrigo has not alleged any recoverable damages due to the Agreement's limitation of liability provision.  Doc. 97 at 20.  It further asserts that Perrigo's allegation that it is entitled to damages for the threat to the viability of Perrigo's EH formula business is unduly speculative and thus unrecoverable.  *Id.* at 22 n.11.

Perrigo contends that its allegations are sufficient to show that Mead Johnson's actions were ████████████████████████████████████████████████████ ████████████████████████████████ Doc. 104 at 16.  It also argues that the damages it seeks from the injury to its EH formula business are not speculative because it has not manufactured EH formula for over a year, and its relationships with its EH customers have been harmed.  *Id.* at 21.  And Perrigo asserts that, in any event, it has alleged direct damages, which are not covered by the limitation of liability provision.  *Id.* at 20.

    *i.   Perrigo Fails to Allege that Any Indirect Damages Are Recoverable*

Perrigo alleges that the damages it seeks are not barred by the limitation of liability provision because Mead Johnson's breaches of its packaging obligations were █ ████████████████████████████████████████████████ *E.g.*, Am. Compl. ¶ 38.  Perrigo relies on, among other things, Mead Johnson's complaint with the NAD and its refusal to ██████████ Doc. 104 at 18.

Mead Johnson argues that Perrigo's allegations are insufficient to plead that Mead Johnson's actions constitute ████████████████████████████████████ because:  (1) Mead Johnson acted in its own economic self-interest, which is insufficient to void the limitation of liability provision; (2) its challenge to Perrigo's advertising claims before the NAD was not frivolous; and (3) Perrigo's customers are not entitled to ████████████████████████████████ while it has already ██████████████████████ ████ Doc. 97 at 20–22.

Determinations as to whether a contractual party has acted in bad faith "generally present factual questions inappropriate for resolution on a motion to dismiss." *CAMOFI Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006). Perrigo "must, however, allege sufficient facts to support a finding of bad faith, [intentional wrongful actions], or gross negligence" by Mead Johnson. *See id.*

At the outset, the Court agrees with Mead Johnson that Perrigo's allegations regarding Mead Johnson's NAD challenge and the refusal to allow ███████ █████████████ are not sufficient to void the limitation of liability provision because they relate only to conduct unconnected to the alleged breach at issue—namely, Mead Johnson reneging on its packaging obligations. The Court must "tak[e] the allegations as a whole" and thus consider all of Mead Johnson's alleged misconduct in determining whether it acted in bad faith. *See Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 65 (2d Cir. 2012). However, "it is insufficient for the plaintiff to allege or show that the defendant acted with malice or reckless indifference *in the general course of conduct* between the parties. Rather, the defendant must have acted with malice or reckless indifference *in breaching the contract specifically*." *In re Lyondell Chem. Co.*, 544 B.R. 75, 88 (Bankr. S.D.N.Y. 2016).

Perrigo's allegations that Mead Johnson challenged Perrigo's advertising claims before the NAD and refused to allow Perrigo's customers to ██████████████ █████████████ are not connected to Mead Johnson's breach of its packaging obligations, aside from Perrigo's conclusory statements that these actions were taken to harm Perrigo's business and its allegations that they occurred in close temporal proximity. Thus, because these allegations "involve conduct unrelated to [Mead Johnson's] alleged breach . . . [they] are insufficient to provide a basis for invalidating the limitation on damages clause." *See id.* at 89–90; *see also Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 509 (N.Y. 1994) (enforcing limitation of liability

clause where the "alleged misconduct by defendant during the course of its performance of the contract" was "totally irrelevant" to the specific breach at issue).

Furthermore, Perrigo's allegation that Mead Johnson challenged Perrigo's advertising claims before the NAD is insufficient to show that Mead Johnson acted in bad faith because the claims were not frivolous.  In the context of legal claims, "a party who has a non-frivolous claim or defense cannot be said to have brought an action in bad faith, even if that claim or defense is asserted for an improper purpose." *Societe Del Hotels Meridien v. LaSalle Hotel Operating P'ship*, No. 02-cv-4090 (JSM), 2003 WL 21982959, at *1 (S.D.N.Y. Aug. 20, 2003).  In *Societe*, the court denied the defendants' motion for attorney fees—which could be awarded only in cases of fraud or bad faith— because "[a]lthough the Court in its prior opinions rejected Plaintiff's arguments, those opinions also demonstrate that the arguments had some substance and were far from frivolous." *Id.*  It cannot be disputed that some of Mead Johnson's claims before the NAD were successful, so the challenge was not frivolous.  Thus, the Court does not credit this allegation as demonstrating any evidence of bad faith.

Next, the Court considers Mead Johnson's argument that, even when viewed as a whole, Perrigo's allegations fail as a matter of law because they merely suggest that Mead Johnson acted in its own economic self-interest.  Doc. 109 at 8–9.  Perrigo argues that self-interest is evidence of bad faith when it is "part of a larger purpose to injure the other party."  Doc. 104 at 19 (quoting *Barbara v. MarineMax, Inc.*, No. 12-cv-368 (ARR) (RER), 2013 WL 1952308, at *5 (E.D.N.Y. May 10, 2013)).

To show that Mead Johnson acted in bad faith or that its actions were intentionally wrongful, Perrigo must allege facts that suggest such a "larger purpose."  Under New York law, allegations that a party's breach was motived purely by its own economic self-interest will not suffice to show that the breaching party's actions were in bad faith or intentionally wrongful. *See Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 69 N.Y.S.3d 633, 636 (App. Div. 2018) ("The type of intentional wrongdoing that could

31

render a limitation in [a contract] unenforceable is that which is unrelated to any legitimate economic self-interest.  Stated otherwise, a party can intentionally breach a contract to advance a legitimate economic self-interest and still rely on the contractual limitation provision." (internal quotation marks and citations omitted)); *MarineMax*, 2013 WL 1952308, at *5 ("[S]elf-interest, without more, will not support an inference of bad faith."); *see also India.com, Inc. v. Dalal*, 324 F. App'x 59, 61 (2d Cir. 2009) (noting that "bad faith requires a degree of malice or sinister motive"); *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 417 n.5 (N.Y. 1983) (observing that bad faith "connotes a dishonest purpose").

Perrigo has failed to allege that Mead Johnson's conduct was in bad faith or intentionally wrongful because none of its allegations support a plausible inference that Mead Johnson acted specifically to harm Perrigo.  For example, Perrigo does not allege that Mead Johnson attempted to coerce Perrigo by conditioning its performance of the Agreement on Perrigo paying an additional fee or taking any other actions not previously agreed to.  *See Banc of Am. Sec. LLC v. Solow Bldg. Co. II*, 847 N.Y.S.2d 49, 57 (App. Div. 2007) (holding that defendant acted in bad faith where it "engaged in a blatant attempt to compel additional exorbitant payment for services it was obligated to provide and for which it has already received the agreed-upon compensation").

Nor does Perrigo allege that Mead Johnson threatened Perrigo or declared its intent to inflict harm on Perrigo before breaching the Agreement.  *Cf. Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (affirming finding that defendant breached implied duty of good faith and fair dealing by threatening plaintiffs and citing their "vulnerable" position); *CAMOFI*, 452 F. Supp. 2d at 478 (defendant bringing counterclaims alleged that third-party defendant violated covenant of good faith and fair dealing by threatening defendant with financial harm).

Simply put, none of Perrigo's allegations specifically suggest that Mead Johnson intended to harm Perrigo rather than merely to act in its own economic self-interest.

Thus, Perrigo has failed to allege that Mead Johnson acted in bad faith or in an intentionally wrongful way.

However, Perrigo also argues that Mead Johnson's conduct was grossly negligent, which would be an independently sufficient justification for finding the limitation of liability provision unenforceable.  Doc. 104 at 17.  "Gross negligence . . . must smack[] of intentional wrongdoing. . . .  It is conduct that evinces a reckless indifference to the rights of others."  *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1371 (N.Y. 1992) (alteration in original) (internal quotation marks and citation omitted).  In a contract "between sophisticated parties, not implicating public health or safety, New York applies a more exacting standard of gross negligence than it would in other contexts."  *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008).  While New York law is clear that acting out of self-interest alone precludes a finding of bad faith or intentional wrongdoing, it is less clear whether this principle also applies to allegations of gross negligence.  *Compare ACE Sec. Corp. Home Equity Loan Tr. v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 556 (S.D.N.Y. 2014) (explaining that "[c]ontractual nonperformance that is merely in a defendant's economic self-interest does not suffice" to show reckless indifference to the rights of others), *with Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 499–500 (S.D.N.Y. 2018) (disagreeing with *ACE* and observing that defendant's conduct "could well constitute gross negligence" regardless of whether it was in defendant's economic self-interest).

In any event, Perrigo does not sufficiently allege that Mead Johnson acted with reckless indifference to Perrigo's rights under the Agreement.  Perrigo does not allege that Mead Johnson entered the Agreement knowing that it would not be able to fulfill its obligations.  *See Deutsche Bank*, 289 F. Supp. 3d at 500 (holding that breach might constitute gross negligence where "a party's conduct from the outset . . . eliminates the chance for adequate performance").  Nor does Perrigo allege that Mead Johnson knew it

would be unable to fulfill its packaging obligations prior to informing Perrigo that it would not do so.  Based on the allegations in the amended complaint, the Court is unable to plausibly infer gross negligence.  *See VL8 Pool, Inc. v. Glencore Ltd.*, No. 20-cv-02053 (ALC), 2021 WL 1152936, at *3 (S.D.N.Y. Mar. 25, 2021) (enforcing limitation of liability clause where plaintiff made "no allegations regarding when or how this information became known that indicate that [defendant] knew or should have known about this issue at the time of the transaction, or any other relevant time, much less that [defendant] was reckless in failing to inform [plaintiff] about the information"); *cf. Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 967 N.E.2d 666, 669 (N.Y. 2012) (complaint sufficiently alleged gross negligence by asserting that defendants had knowledge "for weeks, if not months," that equipment was malfunctioning").

Therefore, the Court finds that Perrigo has failed to allege that Mead Johnson's alleged breach of the Agreement was in bad faith, grossly negligent, or intentionally wrongful.[12]

### ii. *Perrigo Alleges that Certain Direct Damages Are Recoverable Under Its First Claim*

Perrigo alleges that the limitation of liability provision limits its ability to sue only for indirect damages.  Am. Compl. ¶ 38.  Perrigo seeks damages for the ███████████ ███████████████ that expired because Mead Johnson breached its packaging

---

[12] Mead Johnson also argues that Perrigo's allegations that it is entitled to damages resulting from the threat to the viability of Perrigo's EH formula are speculative and thus must be dismissed.  Doc. 97 at 22 n.11.  Perrigo responds that these damages are not speculative because Mead Johnson's breaches have already harmed Perrigo's relationships with its EH formula customers.  Doc. 104 at 21.  Perrigo then cites *Mitsubishi Motors North America Inc. v. Grand Automotive, Inc.*, No. 18-cv-814 (SJF) (SIL), 2018 WL 2012875, at *13 n.11 (E.D.N.Y. Apr. 30, 2018), for the proposition that "consequential damages for a breach of contract . . . claim can include loss of goodwill, including the loss of customers, future profits, and harm to business reputation."  *Id.*  Perrigo thus concedes that such damages are consequential damages, which are barred by the limitation of liability provision absent any bad faith, gross negligence, or intentional wrongful actions on the part of Mead Johnson.  *See* Doc. 9-1 at 19–20.  Because the Court has already determined that Perrigo has failed to allege any bad faith, gross negligence, or intentional wrongful actions, the Court need not decide whether such damages are unduly speculative.

obligations.  *Id.* ¶ 117.  Perrigo argues that these constitute direct damages and are thus not barred by the limitation of liability provision.  Doc. 104 at 20.

Mead Johnson does not make any explicit counterarguments that such damages do not constitute direct damages.  Instead, it reiterates its argument that Perrigo has waived Mead Johnson's packaging obligations and therefore the damages are still not recoverable.  Doc. 109 at 9.

The court agrees with Perrigo.  "Direct damages are typically expectation damages, measured by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract."  *Latham Land I, LLC v. TGI Friday's, Inc.*, 948 N.Y.S.2d 147, 151–52 (App. Div. 2012).

Under the terms of the Agreement, Mead Johnson is allegedly required to not only package the infant formula it receives from Perrigo, but also return it to Perrigo once it has been packaged.  Am. Compl. ¶ 29.  Perrigo alleges that, on December 9, Mead Johnson had already accepted nearly ███████████ of regular formula for packaging at the Wanamingo Facility.  *Id.* ¶¶ 61–62.  However, despite the requirement to package and return that formula to Perrigo, ██████████ of it was allowed to expire instead.  *Id.* ¶ 117.  In order to put Perrigo in the position it would be in had Mead Johnson performed, Mead Johnson would have to compensate Perrigo for the formula that should have been packaged and returned to Perrigo.  Thus, Perrigo has sufficiently alleged recoverable damages for its first claim (failure to fulfill the August 3 Purchase Order).

However, the same cannot be said for Perrigo's second claim (failure to fulfill the October 11 Purchase Order) because Perrigo does not allege that it ever delivered any EH formula to Mead Johnson for packaging pursuant to that order.  Perrigo's only alleged direct damages are damages related to the expired formula, so it has failed to allege any recoverable damages based on Mead Johnson's failure to accept and fulfill the October 11 Purchase Order.

Therefore, for the foregoing reasons, Mead Johnson's motion to dismiss is denied as to Claim I to the extent Perrigo seeks direct damages, and granted to the extent that Perrigo seeks indirect damages barred by the limitation of liability provision. The motion is granted in full as to Claim II.

### B.  Claim III:  Breach of Contract Relating to the January 9 Agreement

Next, Perrigo alleges that Mead Johnson breached the January 9 Agreement by failing to fulfill its commitment to package ▮▮▮▮▮▮▮▮▮▮▮▮ of regular formula in January 2023.  *Id.* ¶¶ 137–43.

Mead Johnson argues that Perrigo has failed to allege that it breached the January 9 Agreement.  Doc. 97 at 19–20.  According to Mead Johnson, the January 9 Agreement incorporates the MSA's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  Thus, because Perrigo alleges that Mead Johnson completed its packaging obligations by ▮▮▮▮▮▮▮▮▮▮▮▮ Perrigo has not alleged that Mead Johnson failed to meet its obligations.  *Id.*  Mead Johnson also asserts, as with Perrigo's first two breach of contract claims, that Perrigo fails to plead any damages that are not precluded by the limitation of liability provision.  *Id.* at 20.

Perrigo responds that the January 9 Agreement did not incorporate the MSA's ▮▮▮▮▮▮▮ and that, even if it did, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ Doc. 104 at 15.

#### 1.  *Perrigo Has Sufficiently Alleged that Mead Johnson Breached the January 9 Agreement*

The Court need not resolve whether the January 9 Agreement incorporated the ▮▮▮▮▮▮ because, as Perrigo argues, Mead Johnson did not finish packaging the required formula ▮▮▮▮▮▮▮▮ anyway.  The Agreement provides for a ▮▮▮▮▮▮▮▮▮ Doc. 9-1 at 59.  The most natural interpretation of

this language is that ██████████████████████████████████

██████████████████████

Therefore, because Perrigo alleges that Mead Johnson was ███████████ in performing its packaging obligations, it has sufficiently alleged that Mead Johnson breached the January 9 Agreement.

2. *Perrigo Has Sufficiently Alleged Damages that Are Recoverable Under the MSA*

For the same reasons explained previously, because Perrigo has failed to sufficiently allege that Mead Johnson's actions were in bad faith, grossly negligent, or intentionally wrongful, it has also failed to allege that it may recover any indirect damages. None of Perrigo's allegations regarding Mead Johnson's failure to meet the January 2023 packaging commitment compel a different result.

However, as with Perrigo's first claim, by alleging that Perrigo suffered direct damages as a result of Mead Johnson's failure to meet its packaging obligations, Perrigo has sufficiently pled damages that are not precluded by the limitation of liability provision in the MSA. Although the amended complaint does not specifically state that these damages were caused by Mead Johnson's breach of the January 9 Agreement, it alleges that they were the result of "Mead Johnson's failure to fulfill its December 2022 and January 2023 obligations to package regular formula." Am. Compl. ¶ 117. With all reasonable inferences drawn in Perrigo's favor, the "January 2023 obligations" could plausibly include Mead Johnson's obligations under the January 9 Agreement. Thus, Perrigo has sufficiently alleged direct damages that are recoverable for Mead Johnson's breach of the January 9 Agreement.

Mead Johnson's motion is denied as to Claim III to the extent Perrigo seeks direct damages, and granted to the extent that Perrigo seeks indirect damages barred by the limitation of liability provision.

### C.  Claim IV:  Breach of the Implied Covenant of Good Faith and Fair Dealing

Mead Johnson also argues that Perrigo's claim for breach of the implied covenant of good faith and fair dealing must be dismissed because (1) it is duplicative of Perrigo's breach of contract claims, and (2) Perrigo does not plausibly allege that Mead Johnson acted in bad faith.  Doc. 97 at 23.

Perrigo responds that the claim is not duplicative because (1) it rests on an alternative theory from the breach of contract claims, and (2) Perrigo sufficiently alleges that Mead Johnson did not act in good faith.  Doc. 104 at 21.

For the following reasons, the Court agrees with Perrigo.  However, because Perrigo fails to allege that Mead Johnson's actions were in bad faith, grossly negligent, or intentionally wrongful, it may recover only direct damages due to the Agreement's limitation of liability provision.

#### 1.  Perrigo's Claim Is Not Duplicative

Mead Johnson argues that Perrigo's claim is duplicative because it relies on the same allegations and seeks identical damages as the breach of contract claims.  Doc. 97 at 23–24.

Perrigo contends that its claim is not duplicative because the parties dispute the terms of the Agreement.  Doc. 104 at 22.  As detailed above, Perrigo's position is that Mead Johnson is required to accept Perrigo's purchase orders so long as Perrigo ███████ ███████████  *Id.*  By contrast, Mead Johnson argues that the parties' practice of mutually agreeing to packaging schedules altered the terms of the Agreement such that Mead Johnson need only accept purchase orders if the parties have reached agreement.  *Id.* at 22–23.  If Mead Johnson is correct, Perrigo argues, then Mead Johnson would have a duty to "act in good faith and fair dealing when accepting packaging instructions from Perrigo, scheduling packaging at the Wanamingo Facility, and packaging the formula according to the agreed-upon schedule," which it breached by unilaterally refusing to

package sufficient quantities of infant formula in December 2022 and the first quarter of 2023.  *Id.* at 23 (quoting Am. Compl. ¶ 146).

Where a complaint "alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).  However, if "there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 206 (2d Cir. 2018).  It need only be "plausible" that the two claims "could be distinct" to avoid dismissal.  *Melville v. HOP Energy, LLC*, No. 21-cv-10406 (KMK), 2023 WL 2648775, at *8 (S.D.N.Y. Mar. 27, 2023).

The disagreement in *Melville* concerned an express term of the contract, *id.* at *1, while the disagreement in this case pertains to whether the contract was modified.  But the Court finds that the principle applies equally here because in both cases, the parties' disagreement relates to what they were entitled to under the contract.  In *Melville*, the parties' breach of contract dispute centered on whether the defendant's contractual obligation to provide customers with home heating oil at "our Promotional Prevailing Retail Price for First Year Customers" permitted it to charge prices higher than the prevailing retail price in the industry.  *Id.*  Here, the parties' breach of contract dispute hinges on whether their practice of mutually agreeing on packaging schedules permits Mead Johnson to decline a purchase order absent such mutual agreement.

At this stage, because Perrigo's claim for breach of the implied covenant of good faith and fair dealing may survive even if its breach of contract claims fail, it is plausible that the two claims may be distinct.  Thus, the Court finds that Perrigo's claim is not duplicative.

2.   *Perrigo Has Sufficiently Alleged that Mead Johnson Breached the Implied Covenant of Good Faith and Fair Dealing*

Perrigo argues that if Mead Johnson "has no obligation to package infant formula until the parties mutually agree on a packaging schedule," then it was under "an implied obligation to use good-faith efforts to reach—and honor—agreements for packaging schedules." Doc. 104 at 24.  Mead Johnson allegedly breached this obligation by

███████████████████████████████████████████████████████████

████████████████████████████████████████   *Id.* at 24–25.

Mead Johnson argues that Perrigo's implied covenant claim must be dismissed because Perrigo's allegations show, at worst, that Mead Johnson acted in accord with its own economic self-interest, which does not support an inference of bad faith.  Doc. 97 at 24.  It contends that to survive dismissal, Perrigo must plausibly allege that Mead Johnson, in breaching its obligations, intended to injure Perrigo.  *Id.* at 24–25.

The Court finds Perrigo's argument more convincing.  "Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995).  "Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* (internal quotation marks and citation omitted).  "This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (internal quotation marks and citation omitted).

"In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (citation omitted).  "Thus, whether particular conduct violates or is consistent

with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Id.* (citation omitted).

"The implied covenant does not undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (internal quotation marks and citation omitted).  However, "where a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated."  *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).

In this case, Perrigo alleges that the implied covenant pertains not to Mead Johnson's obligations under the contract as written, but rather to Mead Johnson's obligations under the Agreement as modified by the parties' practice of collaboratively reaching mutually agreeable packaging schedules.  Doc. 104 at 24–25.  Thus, to determine whether Mead Johnson's conduct "may be presumed to be contrary to the intention of the parties," the Court must determine how, if at all, the parties intended to modify the Agreement through such practice.  Such a determination should not be made on a motion to dismiss where, as in this case, the terms of the contract are not clear.  *Cf. Vectron Int'l, Inc. v. Corning Oak Holding, Inc.*, 964 N.Y.S.2d 724, 726 (App. Div. 2013) ("In the context of a motion to dismiss, if the contract's language is ambiguous, then the motion must be denied to permit the parties to discover and present extrinsic evidence of the parties' intent.").

Furthermore, Perrigo has sufficiently alleged that Mead Johnson's alleged repudiation of its packaging obligations was so detrimental to Perrigo that it "may be presumed to be contrary to the intention of the parties."  *M/A-COM*, 904 F.2d at 136. Perrigo alleges that it informed Mead Johnson of its plans for a January 2023 EH formula

campaign as early as April 2022 and that Mead Johnson agreed to package the formula for the campaign that same month.  Am. Compl. ¶ 53.  Thus, Perrigo has alleged that the parties intended for Perrigo to receive the benefit of Mead Johnson's packaging services for the EH campaign.  Perrigo further alleges that it repeatedly told Mead Johnson about its concerns regarding Mead Johnson's struggles to honor the agreed packaging schedules and that Mead Johnson was responsive to their concerns.  *Id.* ¶ 58.  Mead Johnson also allegedly affirmed its commitment to honor the terms of the Agreement several weeks before repudiating its obligations.  *Id.* ¶ 59.  This suggests that Mead Johnson knew that failing to honor the agreed packaging schedules would not incidentally lessen Perrigo's expected benefit from the contract—but rather that such a failure would so diminish the value of the contract to Perrigo that it was not the intention of the parties for such conduct to be permitted.

The Court thus holds that Perrigo sufficiently alleges that Mead Johnson failed to act in good faith so as to breach the implied covenant of good faith and fair dealing, while also holding that Perrigo has not sufficiently alleged that Mead Johnson acted in bad faith so as to escape the limitation of liability provision.  These holdings are not inconsistent.  The Second Circuit has explained that while "bad faith requires a degree of malice or sinister motive," the implied covenant of good faith and fair dealing requires only "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *India.com*, 324 F. App'x at 61 (internal quotation marks and citation omitted).  In other words, it is possible for a party to breach a contract (including the implied covenant of good faith and fair dealing) without acting in bad faith *or* good faith.  This is precisely what Perrigo alleges.

According to the amended complaint, Mead Johnson knew that Perrigo would need its EH formula packaged in January 2023 far in advance, Perrigo reinforced the importance of Mead Johnson honoring the packaging schedules, and Mead Johnson reassured Perrigo that it would do so before repudiating its obligations.  Am. Compl.

¶¶ 53, 58–59.  This is sufficient to allege that Mead Johnson knew its breach would significantly harm Perrigo.  However, Perrigo makes no plausible allegations that Mead Johnson *intended* to cause such harm.  Rather, based on Perrigo's allegations, the Court can conclude only that Mead Johnson, "although not motivated by bad faith or animus to [Perrigo], nonetheless did breach its duty of good faith and fair dealing" by failing to act in good faith in reaching—and honoring—a mutually agreeable packaging schedule.  *See India.com*, 324 F. App'x at 62.

Thus, Perrigo has sufficiently alleged that Mead Johnson breached the implied covenant of good faith and fair dealing.

### 3. *Perrigo Has Sufficiently Alleged Damages that Are Recoverable Under the MSA*

"Under New York law, '[p]roof of damages is an essential element of a claim for' breach of the implied covenant of good faith and [fair] dealing."  *Golden Unicorn Enters., Inc. v. Audible, Inc.*, --- F. Supp. 3d ---, No. 21-cv-7059 (JMF), 2023 WL 4561718, at *9 (S.D.N.Y. July 17, 2023) (first alteration in original) (quoting *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016)).

For the same reasons explained previously, the Court finds that, because Perrigo has failed to sufficiently allege that Mead Johnson's actions were in bad faith, grossly negligent, or intentionally wrongful, it has also failed to allege that it may recover any indirect damages.  However, the Court has also already determined that Perrigo has sufficiently alleged it may recover direct damages pursuant to its breach of contract claims.  For the same reasons, the Court finds that Perrigo has alleged it may recover those damages pursuant to its claim for breach of the implied covenant of good faith and fair dealing.

Therefore, Mead Johnson's motion to dismiss is denied as to Claim IV to the extent Perrigo seeks direct damages, and granted to the extent that Perrigo seeks indirect damages barred by the limitation of liability provision.

### D.  Leave to Amend

In its opposition, Perrigo requests leave to amend in the event the motion to dismiss is granted.  Doc. 104 at 25 n.15.  Mead Johnson asserts that the Court should dismiss the complaint with prejudice because any attempt to replead would be futile.  Doc. 109 at 10.  Rule 15 instructs courts to "freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  The "usual practice" in this Circuit upon granting a motion to dismiss is to permit amendment of the complaint.  *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446–47 (S.D.N.Y. 2014) (quoting *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)).

Because it is possible that Perrigo could plead additional facts to remedy some of the deficiencies identified in this opinion without prejudice to Mead Johnson, leave to amend is granted.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189–90 (2d Cir. 2015) (finding that "the district court exceeded the bounds of its discretion in denying Plaintiffs leave to amend their complaint" and that an amended complaint "may cure the remaining defects" identified by the court).  For example, Perrigo could add allegations that allow the Court to plausibly infer that Mead Johnson's actions were in bad faith, grossly negligent, or intentionally wrongful.

Perrigo will not be given unlimited opportunities to amend, however, as it is now on notice of the deficiencies in its pleadings.  *See, e.g.*, *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 351 (S.D.N.Y. 1999) ("[W]here a plaintiff is on notice of deficiencies in an initial pleading and has had the opportunity to cure them by a first amendment, dismissal with prejudice is proper when a complaint previously has been amended." (internal quotation marks and citation omitted)).

**IV.     CONCLUSION**

For the foregoing reasons, Mead Johnson's motion is GRANTED IN PART and DENIED IN PART.  The requests for oral argument, Docs. 99, 106, are DENIED as moot.

Perrigo's claims are dismissed without prejudice to the extent Perrigo seeks indirect damages barred by the limitation of liability provision in the Agreement.  The claims may proceed to the extent Perrigo seeks direct damages.  Perrigo may file an amended complaint by April 16, 2024.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 96, 99, 106.

It is SO ORDERED.

Dated:     March 26, 2024
           New York, New York

_____
     EDGARDO RAMOS, U.S.D.J.